**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| JOSEPH A. KOTTAS<br>500 Caddy Circle<br>Pagosa Springs, CO 81147; and<br><br>KOBO INVESTMENTS, LLC<br>2405 Central Ave<br>Dodge City, Kansas 67801<br><br>         **Plaintiffs,**<br>vs.<br><br>STEPHEN Z. SLADE,<br>in his official and individual capacity,<br>1122 U.S. Hwy 84<br>Pagosa Springs, CO 81147;<br><br>KARL JOHNSON<br>in his official and individual capacity,<br>1122 U.S. Hwy 84<br>Pagosa Springs, CO 81147; and<br><br>ARCHULETTA COUNTY, COLORADO<br>c/o Archuletta County Board of<br>Commissioners<br>449 San Juan Dr.<br>Pagosa Springs, CO 81147<br><br>         **Defendants.** | Case No.: |

## COMPLAINT

COME NOW Joseph A. Kottas ("Kottas") and Kobo Investments LLC ("Kobo") (collectively, "Plaintiffs"), and for their causes of action against Stephen Z. Slade, in his individual and official capacity ("Slade"), Karl Johnson, in his individual and official capacity ("Johnson"), and Archuletta County, Colorado ("County") (collectively, "Defendants"), state and allege as follows:

1

**PARTIES**

1.      Kottas is an individual and Colorado resident.

2.      Kobo is a Kansas limited liability company.

3.      Slade is an individual and resident of Colorado.

4.      Johnson is an individual and resident of Colorado.

5.      The County is a political subdivision of the State of Colorado.

**JURISDICTION AND VENUE**

6.      Jurisdiction and Venue are proper in this Court because this Court is the only federal court in Colorado, and the claims stated herein arise under 42 U.S.C. § 1983 and thereby present a federal question of Defendants' liability for this Court to determine. See 28 U.S.C. § 1331.

**FACTS RELEVANT TO ALL COUNTS**

7.      All the above paragraphs are incorporated herein by reference.

8.      Kottas, who used to be a resident of Kansas, frequently vacationed with friends and family in Colorado since he was a young child, including staying many times at short term vacation rentals ("STRs") in Pagosa Springs.

9.      After spending years as an adult staying in STRs in Colorado, including in Pagosa Springs, Kottas became interested in STRs as a potential investment.

10.      In October 2018, after conducting research and analysis of the STR industry in Pagosa Springs and elsewhere, Kottas purchased 224 Midiron Ave, Pagosa Springs, Colorado 81147 ("Midiron") for the sole purpose of generating rental income from the property as an STR.

11.      At the time Kottas purchased Midiron, there were no regulations in effect that governed the use of real estate as STRs in Archuleta County, although the County had passed

2

approximately three months prior, on July 16, 2018, a resolution to amend the Archuleta County Land Use Regulations ("LURs") to include provisions requiring the owners of STRs to apply for permits to operate as STRs. The resolution required STR owners to apply for permits no later than December 31, 2018.

12.     In August or September 2019, Kottas purchased 500 Caddy Circle, Pagosa Springs, Colorado 81147 ("Caddy Circle"), again for the sole purpose of generating rental income from the property as an STR.

13.     On March 13, 2020, Kobo, which Kottas equally owns with a business partner who is currently a Kansas resident, purchased 404 Monte Vista Dr., Pagosa Springs, Colorado 81147 ("Monte Vista"), for the sole purpose of generating rental income from the property as an STR.

14.     On March 23, 2020, Colorado's General Assembly passed a bill (H.B. 20-1093) amending C.R.S. § 30-15-401 so that it allowed counties to "license and regulate an owner or owner's agent who rents or advertises the owner's lodging unit for a short-term stay, and to fix the fees, terms, and manner for issuing and revoking licenses issued therefor." C.R.S. § 30-15-401(s)(I). This law went into effect on September 14, 2020. See C.R.S. § 30-15-401.

15.     Prior to the passing of H.B. 20-1093, Colorado's General Assembly had passed no legislation authorizing the licensing or regulation of STRs in Colorado.

16.     In November 2020, Kobo purchased 310 Twin Creek Circle, Pagosa Springs, Colorado 81147 ("Twin Creek"), for the sole purpose of generating rental income from the property as an STR.

17.     In March 2021, Kobo purchased 387 E. Log Hill Road, Pagosa Springs, Colorado 81147 ("Log Hill"), for the sole purpose of generating rental income from the property as an STR.

3

18.    Plaintiffs have never used any of their properties in Pagosa Springs as anything other than vacation rentals during the times relevant to this complaint, although Kottas moved into the Caddy Circle property and became a Colorado resident in late 2022.

19.    At the time of the enforcement action complained about in this case, the Caddy, Twin Creek, and Log Hill properties had active STR permits with respective expiration dates of February 28, 2023, December 31, 2022, and May 31, 2023.

20.    As for the Midiron and Monte Vista properties, and as required by Archuletta County Land Use Regulation ("LUR") § 3.2.7.6(7), Plaintiffs completed and submitted their renewal applications for these properties prior to the expiration of their prior permits, which respectively expired in March and April 2022.  Pursuant to LUR § 3.2.7.3, the renewal permits had been approved upon determination by the Archuleta County Development Director that the renewal applications were complete, and the approval was based "upon the facts presented in the application and in due consideration of the criteria for review."

21.    However, Midiron and Monte Vista were going through a post approval inspection process pursuant to LUR § 3.2.7.6(2) and (4) "to verify the accuracy of the information submitted during the application process, as well as the compliance or continued compliance with conditions of approval, applicable building codes, land use codes, zoning restrictions, and other standards for Vacation Rental operations."

22.    Slade, who at the time was the only County Code Enforcement Officer other than Johnson, conducted the post approval inspection for Monte Vista on May 31, 2022.

23.    At the time of the inspection, Monte Vista had been operated by Kobo as an STR since 2020 and had been advertised as having four bedrooms with a 10-person available occupancy.  However, on May 18, 2021, during the pendency of Monte Vista's prior STR permit,

the County adopted Resolution 2021-29, which materially modified the LURs by adding new sections relating specifically to the Vacation Rental permitting process, § 3.2.7 *et. seq.* and placing further restrictions on occupancy on a per room basis, § 5.5.6 *et seq.*

24.    Particularly, although the prior version of the LURs tied the allowed occupancy of STRs to the number of "bedrooms" in the STR (specifically, "2 overnight guests per bedroom, plus up to two other guests per dwelling"), Resolution 2021-29 added an additional requirement that a "sleeping room . . . must contain at least seventy (70) square feet of floor space for the first guest, and fifty (50) square feet of floor space for each additional guest."  LUR § 5.5.6.3(4)b.1. This was ostensibly based on the Colorado Department of Health and Environment's regulations, specifically 6 CCR § 1010-14:9.4.

25.    Additionally, the Resolution added a "guest capacity per bed" requirement based on an unidentified "industry standard for mattress size."  See LUR § 5.5.6.3(4)b.3. The new regulatory section states that, "King-, California king-, and queen-size mattresses are calculated as having a two-guest capacity. All others, including full-, double-, single-, and twin size are calculated as having a one-guest capacity." *Id.*

26.    These new provisions also directed that "[a]ny excess sleeping capacity must be removed from all advertising as a condition for approval of the VRP, as applicable." See LUR § 5.5.6.3(4)a.1.

27.    During the post approval inspection process of Monte Vista on May 31, 2022, Slade relied upon the new standards to determine that one of the 4 bedrooms at Monte Vista, *i.e.*, the "bunk room" containing a double-bunk bed, was only 111.76 sq ft, which was approximately 8.24 square foot shy of the 120 square foot required for the room to accommodate two people under LUR § 5.5.6.3(4)b.1. Accordingly, Slade determined that the bunk room should be limited to one

overnight guest and sent a written notice to Kottas directing him to (a) update the advertising of Monte Vista to accurately reflect the sleeping capacity of 4 bedrooms with only a 9-person available occupancy and (b) "remove 1 bunk."

28.     In June 2022, as is consistent with the guest capacity limitations based on "mattress size" in LUR § 5.5.6.3(4)b.3, Slade clarified to Kottas both verbally and in writing that the "remove 1 bunk" requirement in the May 31, 2020, notice could be satisfied by removing the top mattress (or "bed") of the double-bunk bed. This clarification came after Kottas explained that the double-bunk system in the bunk room was a 4-to-5-hundred-pound solid wood system that could not be easily moved or structurally modified.

29.     On July 13, 2022, after Kottas changed his advertised occupancy to 4 bedrooms accommodating 9 guests, Slade sent an email to Kottas stating that he wanted the extra bed (and related photographs on Monte Vista's Airbnb and VRBO listings showing the additional bed) removed by July 15, 2022. Slade also declared in the July 13 email that, "[b]ecause the issue is a matter of potential over occupying of rental space, the County reserves the right to inspect 404 Monte Vista at any time during the permitted year, providing 1 hour notice." Slade also stated that if "the bed (and related pictures) is not removed, I will be sending a final Notice of Violation asking you to cease renting . . .."

30.     On the morning of July 14, 2022, at 8:51 a.m. Kottas sent an email to Slade explaining that he had removed all the photos of the double-bunk system from all advertisements and inquired as to why Slade was "being so aggressive with threats of non-compliance on this property."

31.     At 11:48 a.m. Slade sent an email responding to Kottas' inquiry as to why Slade was acting so aggressively.  Slade denied he was acting aggressively and said, "kindly shoot me a

picture of the bed reduction before close of business (4pm) tomorrow."  Slade sent an immediate follow-up email at 11:49 a.m. to Kottas stating, "you'll need to work with me on this through COB tomorrow."

32.     At that point, the following timeline of events and communications occurred, with many of the communications being copied to the undersigned legal counsel:

a.  July 14, 2022, at 11:49 p.m. MT: Kottas emailed Slade and City Planner Brandon Wolff ("Wolff"), stating the following: "Already removed pics and spoke to Brandon [Wolff] on the property. Left him a message as well. *Will send him a pic of the bunk bed that has removed the top bunk. And once next guest leave I'll take a pic of the top bunk not having mattress*." (emphasis added)

b.  July 14, 2022, at 11:55 p.m. MT: Kottas emailed Wolff, Chris Boys (the other owner of Kobo), Plaintiffs' property agent Sasha Streiber, and the undersigned counsel a clearly photoshopped photo of the double-bunk system with the top portion of the bunk-system completely removed from the photograph, as opposed to just the mattress.

c.  July 14, 2022, at 1:28 p.m. MT:  Kottas emailed Slade (again copying Wolff and legal counsel), stating again "Well I sent Brandon the modified photo and told him *I would send another one showing mattress removed from top bunk once current guest check out Saturday morning*." (emphasis added).

d.  July 14, 2022, at 1:35 p.m. MT:  Wolff forwards Kottas' 11:55 p.m. MT email of the clearly photoshopped photo to Slade and Karl Johnson.

e. July 14, 2022, at 5:59 p.m. MT: Slade forwards Wolff's email, copying Kottas and others, stating "Joe, thank you for removing the bed from bedroom 3."

f. July 16-19, 2022: A group of STR guests check into Monte Vista property on July 16 and check out at approximately 11:30 a.m. MT, just after the Kobo's agent arrives to clean the property for the next guests. None of the guests slept in the bunk room, although the bottom bunk bed was left slightly messy due to young children having played in the room.

g. July 19, 2022, between approximately 11:30 a.m. and 3:00 p.m. MT: While Kobo's property agent is cleaning the property but not on the main level, Slade (or upon information and belief, Johnson or another representative of the County acting on Slade's direction) surreptitiously enters the home without notice and without knowledge or consent of any owner, owner's agent, or guest of the property. In fact, the guests had all departed, and the only person present was Kobo's cleaner. Slade or his agent entered the home unnoticed, went through the main floor hallway and into the bunk room for the purpose of taking a photograph of the double-bunk system in the bedroom.

h. July 19, 2022, at 6:17 p.m. MT: Slade sends an email to Kottas attaching a Notice of Violation and Permit Denial for Monte Vista. The July 19 Monte Vista Revocation, signed by Slade, alleged *he* (as the "designee" of the Director of County Development) was denying Monte Vista a permit because Kobo allegedly had not removed the "excess bed" from the bunk

8

room but instead "confirmed the reduction in occupancy submitting a 'modified' or photoshopped bunk picture with one bed removed, on July 14, 2022.'" Slade attached to the July 19 Monte Vista Revocation a photograph of the double-bunk system "observed in bunk room on July 19, 2022." Slade ordered Kobo in the Notice to remove "all advertising" for the STR and "cancel all current and future bookings," and he assessed a fine of $100 per day "for every day short-term rental advertisement and bookings continue at this property."

i.  July 19, 2022, at 7:44 p.m. MT: Kottas sends an email to Slade, copying Wolff, stating: "Stephen, *I already told Brandon it was modified.* You could clearly see that. [I] was just waiting for our last guest to leave before I sent the actual photo of mattress from top bunk being removed. *The big question is how you observed the bunk without notifying us of inspection??*" (emphasis added).

j.  July 20, 2022, at 9:00 a.m. MT: Slade never answered Kottas' question regarding Plaintiffs' Fourth Amendment Constitutional Rights, but he emailed Kottas and Kobo's agent, stating Slade will be at Monte Vista "at 10am to exercise 1 hour notice, and post a Stop Use placard. You or your representative are welcome to meet me at the home to discuss the bunk bed in question, should you desire."

k.  July 20, 2022, at approximately 10:00 a.m. MT: Slade approaches the house, staples a "Stop Use Notice" to the exterior of the home, and is met by Kobo's agent telling Slade that the bed at issue was not in the home and

inviting Slade to "see for himself." Slade stated, "I don't need to come in the house," and he abruptly left the premises. Slade reported later in an email that Kobo's agent allegedly became frustrated and asked him if he "worked for the Gestapo" and that he should "move to Germany."

l. July 21, 2022, at 10:56 a.m. MT: Kottas sends an email to Wolff attaching a photograph of the double-bunk system with the top mattress removed.

33. Although the mattress at issue had in fact been removed as requested from the Monte Vista property, Slade nonetheless sent a series of formal notices to Kottas hours after Slade's normal shift ended on July 21, 2022, indicating that *all* Plaintiffs' remaining permits on Caddy, Twin Creek, Midiron, and Log Hill were all being revoked under LUR § 1.4.3.3 because, allegedly, "A falsified document or photo was submitted to the Planning Department as part of the permit approval process."

34. Although the substance of LUR § 1.4.3.3 appears to have been removed by the County in 2021 via Resolution 2021-76 (October 5, 2021), LUR § 1.4.3.3 at one point provided that "any development approval or other form of authorization required under these Regulations may be revoked when the Director of County Development, *or designee*, determines . . . that *the* development approval was procured by false representation . . . ." (emphasis added).

35. As with Monte Vista, Slade's written notices for all the other properties ordered Plaintiffs to remove all advertising for the STRs and to "cancel all current and future bookings."

36. Slade also affixed "Stop Use Orders" to each of the properties while many or all of them were occupied with guests, and all such orders stated that penalties of $100 per day were being assessed until the orders are followed.

37. None of the notices or orders provided Plaintiffs with any options for corrective action to avoid the revocations.

38. Slade's actions were clearly taken against Plaintiffs in retaliation for them exercising their rights under the First Amendment of the United States Constitution to complain of the violation of their Fourth Amendment Right against unreasonable searches and seizures and because Slade's particular malice towards Plaintiffs as a "class of one" entitled to protection under the Equal Protection Clause of the Fourteenth Amendment.

39. These actions caused significant economic damage to Plaintiffs.

40. As of July 19, 2022, Plaintiffs had the following scheduled booking contracts and expectations of profit on their investments:

| **PROPERTY** | **RESERVATIONS** | **EXPECTED PROFIT** |
|---|---|---|
| Caddy | 11 | $18,277.32 |
| Twin Creek | 11 | $20,526.42 |
| Log Hill | 9 | $29,518.56 |
| Midiron | 2 | $1,139.75 |
| Monte Vista | 10 | $13,785.79 |
| | **TOTAL** | **$83,247.84** |

41. Moreover, the average monthly revenues and mortgage payments on each Plaintiffs' properties is as follows:

| **PROPERTY** | **MONTHLY REVENUE** | **MONTHLY MORTGAGE** |
|---|---|---|
| Caddy | $8,375.44 | $2,516.41 |
| Twin Creek | $9,841 | $3,254.08 |

| Log Hill | $10,878.67 | $4,284.47 |
| Midiron | $3,728.75 | $1,464.16 |
| Monte Vista | $5,741.91 | $2,515.40 |
| TOTALS | **$38,565.77** | **$14,034.52** |

42.     Plaintiffs relied heavily upon the revenue generated from their STRs to live and raise their families, as well as paying the mortgages and other expenses on each of the properties. If Plaintiffs followed Slade's unlawful orders, they would have suffered extreme financial hardship in losing this revenue, and risk being foreclosed upon or having to sell the properties at values substantially less than normal market-based transactions.

43.     Slade's orders also immediately threatened to deprive Plaintiffs' investment-backed expectations of $83,247.84 from the currently scheduled booking contracts.  Plaintiffs had to refund one booking due to Slade's actions in illegally posting Stop Use Orders on the properties, as the guests did not feel comfortable due to Slade's activities on behalf of the County.

44.     Plaintiffs have also spent substantial sums to improve their properties in the last year in reliance upon the reasonable expectation of the continued validity and/or renewal of their permits according to the procedures and standards set forth in the LURs, which do not allow the actions taken by Slade on behalf of the County.

45.     Moreover, on July 25, 2022, Slade sent another email to Plaintiffs indicating that they have incurred assessed penalties in the amount of $3,600, since July 19, 2022, and that the fines on three of the properties have doubled to $200 per day due to Slade allegedly noticing that Stop Use Orders have been removed on those properties.

46.    Plaintiffs refused to cancel any current or future bookings due to the County, let alone Slade, lacking anything authority to permanently revoke or deny long standing permits on these properties under the circumstances of this case and without providing any avenue for recoupment of their losses or taking corrective action. However, Plaintiffs did remove all advertisements.

47.    This amounted to a regulatory taking of Plaintiffs' vested rights in violation of the Fifth Amendment without adequate compensation by the Archuleta County.

48.    Moreover, Slade brazenly violated Plaintiffs State and Federal constitutional rights to due process and rights against unreasonable searches and seizure, which resulted in significant economic damages to Plaintiffs. The alleged fines were also grossly excessive and violated the Eight Amendment to the United States Constitution.

49.    The actions taken by Slade were also in clear retaliation for Plaintiffs exercising their First Amendment Rights and for being investors as opposed to residents.

50.    Although the County eventually reversed Slade's frivolous orders and assessment of fines, Plaintiffs had already suffered significant economic damages, including substantial attorneys' fees and damages to reputation that resulted in lost rentals.

51.    Plaintiffs seek all relief available under 42 U.S.C. § 1983, including but not limited to compensatory damages, punitive damages, and reasonable attorneys' fees.

**COUNT I – VIOLATION OF THE PLAINTIFFS' RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(42 U.S.C § 1983)**

52.    All the above paragraphs are incorporated by reference herein.

53.    The Fourth Amendment assures: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and [that] no

warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. IV.

54.    "[A]bsent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 135 S. Ct. 2443, 2452, 192 L.Ed.2d 435 (2015).

55.    Municipal inspections of private homes must comply with the Fourth Amendment. *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

56.    On July 19, 2022, Slade or, upon information and belief Johnson or another acting on Slade's behalf and direction, surreptitiously entered the Monte Vista property without any notice or consent of any kind, and for the sole purpose of investigating whether Plaintiffs had complied with his order to remove a single mattress from the Monte Vista property.

57.    When Kottas complained of this Fourth Amendment violation on behalf of Plaintiffs, Slade retaliated against Plaintiffs by maliciously, and without authority to do so, issuing revocations and denials for all the Plaintiffs' other properties and without providing any options for corrective action.

58.    Slade or another acting on his direction also entered the premises and stapled or otherwise affixed Stop Use Orders to all Plaintiffs' properties, also in violation of the Fourth Amendment.  Slade then threatened and ultimately assessed double fines should any of the Orders be removed, seizing and interfering with Plaintiffs' property rights in violation of the Fourth Amendment.

59.     In engaging in the above acts, Slade and/or his agents were acting under the color of state law and deprived Plaintiffs of their right under the Fourth Amendment to have their properties secure from unreasonable searches and seizures.

60.     As a result of this constitutional violation, Plaintiffs have suffered and continue to suffer violations of their Fourth Amendment rights, current and ongoing economic damage, nominal damages, and other damages.

## COUNT II – VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO PROCEDURAL AND SUBSTANTIVE PROCESS
## (42 U.S.C § 1983)

61.     The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

62.     "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

63.     When Slade purported to take action in revoking and/or denying Plaintiffs' long standing permits, the LURs provided a discrete number of enforcement remedies to the County, none of which provide notice to Plaintiffs that their permits could be revoked.

64.     Section 1.4.3 of the LURs lists the Remedies and Enforcement Powers available, which are (a) "Denying" or "withholding" approvals "until the violation is corrected;" (b) Granting authorizations "subject to the condition that the violation is corrected;" or (c) and order stopping or suspending permitted uses "on which there is an uncorrected violation of a provision of these Regulations or of a permit."

15

65.     Although Slade relied upon LUR § 1.4.3.3 in support of his alleged revocation of the permits, that section provides that an "authorization required under these Regulations may be revoked when the Director of County Development, or designee, determines . . . that the . . . approval was procured by false representation," the alleged false representation Slade relied upon was not relevant under this section because it was not used to procure any "approval."  Plaintiffs have already obtained approvals.

## COUNT III – GOVERNMENT RETALIATION
### (42 U.S.C § 1983)

66.     Slade's actions were taken in retaliation against Plaintiffs for their exercising their rights protected under both the Fourth and First Amendments to the United States Constitution.

67.     The actions would chill a person of ordinary firmness from exercising those rights.

68.     Plaintiffs suffered damages as a result.

## COUNT IV – MALICIOUS PROSCUTION AND ABUSE OF PROCESS
### (42 U.S.C § 1983)

69.     Defendants utilized process and maliciously prosecuted Plaintiffs for improper and malicious means.

70.     The proceedings terminated in Plaintiffs favor.

71.     There was no due process for supporting the proceedings.

72.     The proceedings resulted in violations of Plaintiffs constitutional rights, including but not limited to their rights under the fourth and first amendments.

## COUNT V – GOVERNMENT DEFAMATION
### (42 U.S.C § 1983)

73. The act of placing Stop Orders on all Plaintiffs' properties and otherwise communicating to renters and potential renters that Plaintiffs did not have authority to rent their properties were objectively false statements.

74. Plaintiffs suffered damage to their reputation to such an extent as to change their legal status.

75. The statements were made maliciously.

76. Plaintiffs suffered economic damages as a result.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants in amount that exceeds $100,000, plus pre- and post-judgment interests, attorneys' fees, and all other damages this Court deems just and equitable.

### JURY DEMAND

Plaintiffs hereby request trial by jury on all issues so triable.

Respectfully submitted:

**GATES SHIELDS FERGUSON
SWALL HAMMOND, P.A.**

By:/s/Court T. Kennedy
Court T. Kennedy KS#22067;MO#59035
10990 Quivira, Suite 200
Overland Park KS 66210
Phone: (913) 661-0222
Fax:  (913) 491-6398
ckennedy@gatesshields.com

**ATTORNEY FOR PLAINTIFFS**